**POMERANTZ LLP**
Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
1100 Glendon Avenue, 15th floor
Los Angeles, CA  90024
Phone: (310) 432-8492
Fax:     (310) 861-8591
Email: jlurie@pomlaw.com
Email: abasser@pomlaw.com

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter (*pro hac vice to be requested*)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Phone: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SYNERGY RX PBM LLC, Individually and On Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) Violation of Cal. Bus. & Bus. Prof. Code § 17200, *et seq*.<br>(2) Fraudulent Misrepresentation<br>(3) Negligent Misrepresentation<br>(4) Breach of Implied Duty to Perform With Reasonable Care<br>(5) Accounting<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Synergy RX PBM LLC ("Synergy" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through its undersigned counsel, brings this class action complaint seeking monetary and injunctive relief against Defendant LinkedIn Corporation ("LinkedIn" or the "Company").  Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. LinkedIn promotes itself as the world's largest online network of business professionals with over 700 million members worldwide. As one of its primary sources of revenue, LinkedIn charges advertisers for displaying ads to LinkedIn members. Advertisers pay for these ads based on three metrics: each time an ad is displayed ("impressions"), each time a video ad is watched for a minimum duration ("video views"), or each time an ad is clicked ("clicks"). It is estimated that LinkedIn generated $1.7 billion from ad sales to US-based advertisers in 2020.

2. LinkedIn sells its ads via real-time online auctions in which advertisers compete to show their ads to LinkedIn members. LinkedIn runs a new auction every time a new member logs in, and because LinkedIn boasts hundreds of millions of members, hundreds of millions of these auctions occur every day. Bids in each real-time auction are based on what different advertisers are willing to pay for a particular metric (i.e., impression, video view, or click), and then based on those bids and other factors, LinkedIn's software programmatically determines (within milliseconds) which ad to show to a particular LinkedIn member and at what price.

3. The prices advertisers are willing to pay for LinkedIn ads depends on ad performance; that is, the rate at which LinkedIn members see and interact with the ads displayed to them. To enable advertisers to measure ad performance — and make informed decisions concerning ad spending — LinkedIn provides an interface called Campaign Manager that displays impressions, video views, and clicks per ad, as well as numerous derived metrics that incorporate those three base metrics as inputs (for example, "view rate," which is calculated as video views divided by impressions).

4.      LinkedIn has long represented to advertisers that they can rely on the metrics in Campaign Manager to accurately analyze the performance of their ad campaigns. As noted, based on such performance, advertisers determine their ad spending. For example, advertisers might consider the percentage of members who watched a video ad ("view rate") in deciding whether to buy more video ads, and how much to pay for those ads (with higher video view rates motivating advertisers to buy more video ads, and pay more for those ads in the auctions).

5.      Advertisers do not have access to the systems necessary to audit and verify the data underlying the metrics displayed in Campaign Manager; only LinkedIn has such access. Accordingly, advertisers rely on LinkedIn's representations concerning the accuracy of the metrics in Campaign Manager, and rely on LinkedIn to implement systems to detect any errors that might inflate those metrics.

6.      On November 12, 2020, LinkedIn announced that measurement errors discovered in August 2020 inflated metrics tied to impressions and video views for more than two years, "potentially impacting" over 418,000 advertisers during that timeframe. For example, LinkedIn recorded video views for video ads that continued to play off-screen, which would have inflated video view rates (as a LinkedIn spokesperson confirmed). In other instances, LinkedIn recorded impressions when members simply rotated their phones.

7.      The inflated metrics that LinkedIn disclosed went undetected for so long because LinkedIn's internal auditing processes and systems have been deficient for years. LinkedIn knew this and admitted as much in its November 2020 announcement when it disclosed that, as a result of discovering the inflated metrics, it would begin "investing in improvements to our processes and systems," and retain the Media Rating Council ("MRC") — a media industry watchdog — to "audit our metrics." LinkedIn could and should have taken these steps years ago. Had it done so, the inflated metrics only first discovered in August 2020 would have been promptly detected and fixed before causing harm to advertisers. But it did not do so because inflated metrics boosted LinkedIn's revenue.

8.      In its announcement, LinkedIn advised that it had issued "credits" to advertisers "potentially impacted" by the inflated metrics. But it has never disclosed how it calculated these "credits," or how it determined which advertisers were "impacted." Instead, LinkedIn has taken the position that it is free to unilaterally decide without any accountability which advertisers to compensate, and what sums to pay them (apparently based solely on PR considerations). That is unacceptable. Having effectively admitted that deficient auditing systems inflated key metrics for hundreds of thousands of advertisers for more than two years, LinkedIn is obligated to fully compensate all impacted advertisers for all the harm caused by those inflated metrics.

9.      In particular, since — as LinkedIn confirmed — invalid impressions and video views inflated the metrics displayed in Campaign Manager for over two years, then during that timeframe, ads *appeared* to perform better than they actually did. And since better ad performance leads advertisers to buy more ads, and increase the prices they pay for those ads, then — for more than two years — advertisers paid higher prices for ads than they otherwise would have paid, and bought more ads than they otherwise would have bought, absent the inflated metrics. There is no indication that LinkedIn is compensating advertisers at all for such harm (even though it substantially benefitted from the higher revenue generated from the inflated pricing).

10.     Moreover, it appears that LinkedIn's measurement errors extend well beyond inflated metrics tied to impressions and video views. According to credible expert and other public sources, LinkedIn's platform is plagued by fraudulent activity, including large volumes of invalid clicks. Thus, for years, advertisers have also been buying more ads, and paying higher prices for ads, based on inflated metrics tied to clicks. Advertisers must also be compensated for this harm.

11.     Finally, the fact that LinkedIn has failed to acknowledge the invalid clicks and other fraudulent activity on its platform discovered by third parties means that Plaintiff and other advertisers continue to face an actual threat of future harm of being further exposed to inflated metrics on LinkedIn that can only be addressed by injunctive relief.

12.     To ensure LinkedIn fully compensates Class members for all harm caused by inflated metrics on LinkedIn's platform, and that LinkedIn implements adequate auditing

CLASS ACTION COMPLAINT

- 3 -

processes and systems to promptly detect and fix future errors that would inflate metrics, Plaintiff asserts claims for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq*. ("UCL"), fraudulent misrepresentation (or in the alternative, negligent misrepresentation), breach of the implied duty to perform with reasonable care, and at a minimum, an accounting, on behalf of itself and all other similarly-situated LinkedIn advertisers.[1]

## PARTIES

13.   Plaintiff is an LLC organized under the laws of the State of Delaware, with its principal place of business in New York.

14.   Defendant is a corporation incorporated under the laws of the State of Delaware, with its principal place of business located at 1000 West Maude Avenue, Sunnyvale, California 94085. Defendant is wholly owned by Microsoft Corporation ("Microsoft").

15.   Defendant conceived, reviewed, approved, directed, and controlled the misconduct conduct alleged herein in California; and invoiced and collected the fees wrongfully earned from such misconduct from California.

## JURISDICTION, VENUE AND CHOICE OF LAW

16.   This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §1332(d)(2), the Class Action Fairness Act of 2005, because at least one member of the Class, which exceeds 100 members in the aggregate, is a citizen of a different state than Defendant and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.   This Court has personal jurisdiction over Defendant because it transacts business in this State, and because the tortious conduct alleged in this Complaint occurred in, was directed to, and/or emanated from California.

18.   Venue is proper in this District under 28 U.S.C. §1391 because Defendant is headquartered in this District, and conducts business transactions in this District, and because the wrongful conduct giving rise to this case occurred in, was directed from, and/or emanated from this District.

---

[1] All emphasis herein is added, unless otherwise noted.

CLASS ACTION COMPLAINT

19.     Defendant's ads agreement contains a choice of law and venue provision providing that if "an issue arises under this Ads Agreement (including non-contractual disputes or claims) and the contracting entity . . . is . . . LinkedIn Corporation, then this Ads Agreement is governed by the laws of the State of California, and any action or proceeding (including those arising from non-contractual disputes or claims) related to this Ads Agreement will be brought in a federal court in the Northern District of California."[2]

## FACTUAL ALLEGATIONS

### A. The Pricing of Online Ads Based on Viewability

20.     For many years, the common practice in the online advertising industry was to charge advertisers for each ad displayed, regardless of where the ad appeared on a user's browser screen. But an ad served does not mean it was actually seen by the user on whose screen it appeared. For example, an ad could appear at the bottom of a screen to where the user never scrolls before leaving a website.

21.     An online ad that is never seen — and thus cannot be clicked or otherwise provoke any user engagement — does not provide any value to an advertiser. That is because, at bottom, advertising is a marketplace for attention. Websites sell the attention of their users to advertisers, and when an ad cannot attract the attention of a real website user (because it is never seen), the advertiser derives no value from that ad. For this reason, there has been growing interest among advertisers in recent years to pay only for ads that were viewed, as measured by technology that records how many pixels of each ad is within a user's view and for how many seconds.

22.     Research has indicated that the inventory of online ad space that is "viewable" is fairly low, while advertiser demand for "viewable" ads is high because "non-viewed" ads do not

---

[2] https://www.linkedin.com/legal/sas-terms (last visited on Jan. 18, 2021).

CLASS ACTION COMPLAINT

- 5 -

provide value.[3] Therefore, websites that offer to reliably charge advertisers based on specific viewability standards can command premium prices.

23.    When an advertiser purchases ads from a website offering to charge based on "viewability," the price the advertiser pays for the ads is based on the *anticipated* level of ad viewability promised by the website. Accordingly, where "advertisers anticipate a high level of ad viewability, they are keen to pay a higher price for ads…."[4] On websites where advertisers cannot verify the *actual* level of viewability, however, and unbeknownst to them, actual ad viewability falls *below* the anticipated level of ad viewability for which they paid, advertisers are harmed because they are paying a higher price than they otherwise would have paid had they known about the lower level of ad viewability.[5] As alleged below, LinkedIn's inflated metrics similarly caused advertisers to pay more for ads than they otherwise would have paid, and buy more ads than they otherwise would have bought, absent the inflated metrics.

**B. LinkedIn's Advertising Offering**

24.    LinkedIn promotes itself as the world's largest online network of business professionals with over 700 million members worldwide.

25.    Since December 2016, LinkedIn has been a division of Microsoft (which acquired LinkedIn in 2016 for $26.2 billion). In its Form 10-K for the year ending June 30, 2020, Microsoft announced that LinkedIn's total revenue in 2020 had grown 20% to $8.1 billion.

---

[3] "Advertising Viewability in Online Branding Campaigns," at 5, 11, May 17, 2017, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2969891 (last visited on Jan. 18, 2021). This article refers to websites that sell advertising as "publishers."

[4] *Id.* at 11.

[5] *Id.* at 11-12.

CLASS ACTION COMPLAINT

- 6 -

26.     One of LinkedIn's business lines is Marketing Solutions, which enables advertisers to create and display ads promoting their products and services to LinkedIn members. It has been estimated that LinkedIn's US-based advertising revenue would grow to $1.7 billion in 2020.[6]

27.     One of the advertising solutions available under Marketing Solutions is "Sponsored Content," which enables advertisers to display single image and video ads within the scrolling news feed shown to LinkedIn members.

28.     Depending on their objectives, advertisers using Sponsored Content ads can elect to be charged for one of three different "billable events" associated with their ads: impressions, video views, or clicks (with LinkedIn distinguishing between "landing page clicks," "engagement clicks," and "clicks").[7]

29.     The actual price an advertiser pays for particular impressions, video views or clicks is determined in real-time, online auctions in which advertisers compete to show their ads to LinkedIn members. Bids are based on what advertisers are willing to pay for a particular metric (i.e., impression, video view, or click), and then based on those bids and other factors, LinkedIn's software programmatically determines (within milliseconds) which ad to show to a particular LinkedIn member. LinkedIn runs an auction every time a LinkedIn member logs in, and thus hundreds of millions of these auctions occur every day.[8] The Interactive Advertising Bureau — the leading association for the online advertising industry — has analogized programmatic online

---

[6] "Microsoft reports strong growth for LinkedIn and cloud platform Azure in Q3 2020" Oct. 29, 2020 https://www.businessinsider.com/microsoft-shows-strong-growth-for-linkedin-azure-in-q3-2020-10 (last visited on Jan. 18, 2021).

[7] "Objective-based pricing for LinkedIn advertising" https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/products/pdfs/Global_Pricing_Microsite_Page_Objective_Based_Pricing_Chart.pdf (last visited on Jan. 18, 2021). *See also* How much does it cost to advertise on LinkedIn https://business.linkedin.com/marketing-solutions/ads/pricing (last visited on Jan. 18, 2021).

[8] LinkedIn's Advertising Cost and Pricing – Overview https://www.linkedin.com/help/lms/answer/7431/linkedin-s-advertising-cost-and-pricing-overview (last visited on Jan. 18, 2021).

CLASS ACTION COMPLAINT

ad auction platforms like LinkedIn to the public financial markets given the high volume of transactions on such platforms and the high speed at which transactions occur.[9]

## C. LinkedIn Charges Premium Prices for its Ads

30.    To secure premium prices for its ads, LinkedIn has purported to incorporate viewability standards into its advertising platform. For example, LinkedIn represents that it only charges an advertiser for an "impression" whenever an ad is "at least 50% in view on a member's device screen or browser window for at least one second on desktop or 300 milliseconds on mobile."[10] LinkedIn further represents that it only charges an advertiser for a "video view" for 2 or more continuous seconds of playback with at least 50% of the video visible on the screen (or a click on a call-to-action, if that happens first).[11]

31.    The actions of a user viewing a LinkedIn ad that will lead to a chargeable click are more complex. For example, if an advertiser's campaign objective is user engagement, clicks for single image ads are chargeable in a wide range of scenarios.[12]

32.    To further boost the prices advertisers are willing to pay for its ads, LinkedIn also stresses that the individuals viewing ads on its platform are comprised of highly desirable business professionals. For example, in an August 8, 2016 blog post, LinkedIn noted that "viewability" had become a significant concern for online advertisers, and represented that with "LinkedIn Display

---

[9] "OpenRTB" https://www.iab.com/guidelines/openrtb/ ("Real-time Bidding (RTB) is a way of transacting media that allows an individual ad impression to be put up for bid in real-time. This is done through a programmatic on-the-spot auction, which is similar to how financial markets operate.").

[10] "Sponsored Content Viewability Measurement" https://www.linkedin.com/help/lms/answer/88017 (last visited on Jan. 18, 2021).

[11] "Video Views Campaigns – Chargeable Clicks" https://www.linkedin.com/help/lms/answer/107902 (last visited on Jan. 18, 2021); "Video Metrics in Campaign Manager – Definitions" https://www.linkedin.com/help/lms/answer/85305 (last visited on Jan. 18, 2021).

[12] "Engagement Campaigns – Chargeable Clicks" https://www.linkedin.com/help/lms/answer/107901 (last visited on Jan. 18, 2021).

Ads, programmatic advertisers ***can rest assured knowing their impressions are viewable to a premium audience of professional decision makers and deal influencers***."[13]

**D. The Materiality of Accurate Metrics**

33.    Accurate recording of impressions, video views, and clicks according to LinkedIn's viewability standards is material to advertisers since advertisers obviously do not want to pay for billable events that are invalid (*e.g.*, because a member did not see an ad at all, or did not play it for the requisite amount of time; or a click was from an automated software program (i.e., a "bot") and not a real human).

34.    Accurate measurement of metrics is also material to advertisers because they use these metrics to analyze the performance of their campaigns, and based on that performance, make decisions concerning how much to spend on advertising and what price to pay for ads in auctions. LinkedIn well-understands this, and to meet advertiser demand for analytics, offers advertisers access to an interface called Campaign Manager that displays base metrics (i.e., impressions, video views, and clicks) and numerous derived metrics for individual ads in tables designed to let advertisers easily evaluate how their ads are performing.[14]

35.    For example, an advertiser that launched a video ad can access a derived metric called "view rate," which is a percentage calculated by dividing the number of video views by the number of impressions, and then multiplying by 100 (to convert to a percentage). LinkedIn also offers metrics that disclose how long LinkedIn members watched a video at different milestones

---

[13] "How LinkedIn Is Solving the Viewability Conundrum in Programmatic Advertising" Aug. 8, 2016 https://business.linkedin.com/marketing-solutions/blog/linkedin-b2b-marketing/2016/how-linkedin-is-solving-the-viewability-conundrum-in-programmati (last visited on Jan. 18, 2021).

[14] As noted, a base metric is based on a direct count of raw data (*i.e.*, the total number of impressions, video views or clicks) based on LinkedIn's viewability standards, while a derived metric is based on calculations using direct metrics as inputs (e.g., view rate is derived by dividing video views by impressions, and click-through rate is derived by dividing clicks by impressions).

of the video from 25%, 50%, 75% to completion. The following screenshot depicts metrics in Campaign Manager related to video ads: [15]



36.     Similarly, Campaign Manager displays direct and derived metrics to help advertisers analyze performance based on impressions and clicks:



[15] Screenshot taken from frame in "LinkedIn Video Ads Tutorial" https://www.youtube.com/watch?v=3eTV-o5iJMY (last visited on Jan. 18, 2021).

CLASS ACTION COMPLAINT

**E. LinkedIn's Representations Concerning the Accuracy of the Metrics in Campaign Manager**

37.     LinkedIn represents to advertisers that they can rely on the metrics in Campaign Manager to accurately analyze the performance of their ads. For example, on its website, LinkedIn represents that "Campaign Manager . . . reports ***a wide range of metrics*** for every campaign you run. ***Learn how to use that info to measure ad performance and identify opportunities to improve your ROI***."[16] On that same page, LinkedIn also states, "If you want to build brand awareness, you'd want a lot of views and interest (indicated by clicks on ads). ***Focus on these metrics***: Clicks: the number of clicks on links in your ad; Impressions: The number of times people saw your ad." Concerning video views, LinkedIn states "***[g]etting your videos seen is the key result of the Video Views ad objective***. View a wide variety of reporting metrics from the Campaign Manager reporting dashboard, including: Performance metrics; Engagement; Conversions; Bid and Budget."[17]

38.     LinkedIn represents the accuracy of the metrics directly in the Campaign Manager interface that every advertiser uses to analyze its campaigns. For example, in the interfaces depicted in the screenshots in paragraphs 35-36 above, when an advertiser hovers its mouse pointer over the word "Impressions" at the top of the relevant column, LinkedIn displays a hovercard that reads: "Number of times people saw your ad," while hovering over the word "Clicks" at the top of the relevant column displays a hovercard that reads: "Total chargeable clicks based on your campaign's objective," and hovering over the word "Views" in the video metrics interface displays a hovercard that reads: "2 or more seconds of playback while the video is at least 50% on screen, or a click on the CTA [call to action], whichever comes first":



[16] "Analyze your campaign performance" https://business.linkedin.com/marketing-solutions/success/best-practices/analyze-your-performance (last visited on Jan. 18, 2021).

[17] "Video Views - Ad Objective Overview" https://www.linkedin.com/help/lms/answer/104427 (last visited on Jan. 18, 2021).

39.     Advertisers rely on LinkedIn's representations concerning the accuracy of the metrics in Campaign Manager to analyze the performance of their campaigns, and make decisions concerning their ad spending, since they do not have access to the systems necessary to audit and verify the data underlying those metrics; only LinkedIn has such access. Accordingly, advertisers also rely on LinkedIn to implement systems to detect any errors that might inflate the metrics.

40.     As LinkedIn has recently acknowledged, however, its internal auditing processes and systems have long been deficient, which means there have long been measurement errors lurking undetected that inflated metrics for years. In turn, these inflated metrics deceived advertisers into believing that their campaigns were performing better than they actually were, which caused them to pay more for ads than they otherwise would have paid, and buy more ads than they otherwise would have bought, absent the inflated metrics.

**F. LinkedIn Discloses that Metrics Tied to Impressions and Video Views Were Inflated For More Than Two Years**

41.     On November 12, 2020 — in a short 4-paragraph blog post — LinkedIn disclosed as follows:

> We are committed to the transparency and integrity of our ads products. This commitment guides us as we improve our offerings and systems to help ensure we maintain a trusted platform.

> This also means that when something goes wrong, we address it. In August, our engineering team discovered and then subsequently fixed ***two measurement issues in our ads products that may have overreported some Sponsored Content campaign metrics for impression and video views***. ***Together these issues potentially impacted more than 418,000 customers over a two plus year period***. More than 90% of customers saw an impact of less than US $25, and we are currently working with all customers who were impacted to provide full credit to their accounts.

> To ensure we are able to constantly learn and adjust, ***we are working with the Media Rating Council (MRC) to proceed with an audit of our metrics***, collaborating with Moat by Oracle Data Cloud to measure video viewability, ***and investing in improvements to our processes and systems***.

> We are committed to delivering consistent advertising products and analytics that you can rely on and that align with industry and third-party standards. We'll plan

CLASS ACTION COMPLAINT

to share updates on the ongoing work that we're doing to keep our advertising platform safe and trusted.[18]

42.     Media reports in the wake of the disclosure confirmed that LinkedIn's "viewability" standards were violated, which caused metrics to be inflated. For example, the Wall Street Journal reported that video ads that continued to play off-screen were improperly recorded by LinkedIn as video views. A LinkedIn spokesperson confirmed that such errors would have inflated video-related metrics, including video view rates. The Wall Street Journal further stated that impressions were also overreported when, for example, users would rotate their phones or quickly move to other parts of the app.[19] Another publication, Social Media Today, also reported that errors were triggered when users rotated their phones, and that when this occurred, LinkedIn improperly recorded video views, "which were then listed within [advertiser] campaign metrics."[20]

43.     The Wall Street Journal noted that LinkedIn's disclosure came "***after years*** of advertisers demanding more transparency and third-party auditing of the metrics provided by social-media giants." As an example, it referenced a September 2016 incident in which Facebook — like LinkedIn — initially disclosed that a single video ad metric had been inflated for two years.[21] Over the next several months, media sources documented another *eight* measurement

---

[18]"We discovered two measurement issues. Here's how we're making it right" Nov. 12, 2020, https://business.linkedin.com/marketing-solutions/blog/linkedin-news/2020/how-we-re-working-to-improve (last visited on Jan. 18, 2021).

[19] "LinkedIn Finds Measurement Errors That Inflated Video and Ad Metrics" Nov. 12, 2020 https://www.wsj.com/articles/linkedin-finds-measurement-errors-that-inflated-video-and-ad-metrics-11605228577 (last visited on Jan. 18, 2021).

[20]"LinkedIn Discovers Ad Metric Error Which Lead to Over 400k Advertisers Being Overcharged" Nov. 12, 2020 https://www.socialmediatoday.com/news/linkedin-discovers-ad-metric-error-which-lead-to-over-400k-advertisers-bein/588960/ (last visited on Jan. 18, 2021).

[21] "Facebook Overestimated Key Video Metric for Two Years" Sept. 22, 2016 https://www.wsj.com/articles/facebook-overestimated-key-video-metric-for-two-years-1474586951 (last visited on Jan. 18, 2021). *See also* "Facebook Video Metrics Update" Sept. 23, 2016 https://www.facebook.com/business/news/facebook-video-metrics-update (last visited on Jan. 18, 2021).

errors on Facebook.[22] In February 2017, Facebook finally agreed to be audited by the MRC — a nonprofit organization that audits and accredits the measurement of metrics reported by media platforms to advertisers.[23] Less than two weeks later, Google also agreed to work with the MRC.[24]

44.     LinkedIn, however, did not retain the MRC for nearly another four years. Instead, it continued to self-audit, which was reckless since self-auditing is akin to "grading your own homework." As Keith Weed, chief marketing officer of Unilever, observed after Facebook's disclosures in September 2016, "tech companies that don't let third parties measure their platforms is equivalent to '***letting them mark their own homework***.'"[25] Advertising giant Omnicom similarly remarked: "This is why we and many others have been repeatedly saying that third-party verification is ***a fundamental requirement***. Publishers should not '***grade their own homework***.'"[26]

---

[22] "FAQ: Everything Facebook has admitted about its measurement errors" May 17, 2017 https://marketingland.com/heres-itemized-list-facebooks-measurement-errors-date-200663 (last visited on Jan. 18, 2021). *See also* "Facebook Says It Found More Miscalculated Metrics" Nov. 16, 2016 https://www.wsj.com/articles/facebook-says-it-found-more-miscalculated-metrics-1479303984 (last visited on Jan. 18, 2021).

[23] "Facebook agrees to be audited by Media Rating Council following misreporting scandal" https://www.thedrum.com/news/2017/02/10/facebook-agrees-be-audited-media-rating-council-following-misreporting-scandal (last visited on Jan. 18, 2021).

[24] "Google bows to third-party verification demands with YouTube now open to Media Ratings Council audit" https://www.thedrum.com/news/2017/02/21/google-bows-third-party-verification-demands-with-youtube-now-open-media-ratings (last visited on Jan. 18, 2021).

[25] "Facebook Overestimated Key Video Metric for Two Years" Sept. 22, 2016 https://www.wsj.com/articles/facebook-overestimated-key-video-metric-for-two-years-1474586951 (last visited on Jan. 18, 2021). *See also* "Marketers, It's Better To Grade Your Own Homework" Jan 12, 2021 https://www.forbes.com/sites/augustinefou/2021/01/12/marketers-its-better-to-grade-your-own-homework/?sh=6d252514291d (last visited on Jan. 18, 2021).

[26] "Facebook Apologizes for Overstating Video Metrics" https://www.nytimes.com/2016/09/24/business/media/facebook-apologizes-for-overstating-video-metrics.html (last visited on Jan. 18, 2021). While the inflated metrics disclosed by Facebook did not directly affect billing, a class of advertisers sued Facebook on the grounds that the inflated metrics caused advertisers to pay more for ads than they otherwise would have paid; Facebook ultimately settled the case for $40 million. "Facebook agrees to pay advertisers $40M in settlement over inflated ad metrics" https://www.bizjournals.com/sanjose/news/2019/10/07/facebook-ad-metrics-lawsuit-settlement.html (last visited on Jan. 18, 2021).

45.     In particular, social media platforms like LinkedIn that self-audit have a perverse incentive to overlook errors that inflate metrics since they benefit from the higher revenue generated by inflated metrics.[27]

46.     Because LinkedIn self-audited instead of retaining MRC, and concededly failed to adequately invest in its internal auditing processes and systems, LinkedIn's auditing processes and systems were deficient. As a result, measurement errors that inflated metrics and ad prices went undetected for years. LinkedIn knew this and admitted as much in its November 2020 announcement when, after disclosing the inflated metrics, it advised that it would begin "investing in improvements to our processes and systems," and finally retain the MRC to "audit our metrics."

47.     Unfortunately for advertisers, these remedial steps came four years too late. Had LinkedIn retained MRC to audit its metrics when its industry peers did back in early 2017, and adequately invested in its internal auditing processes and systems, the inflated metrics only first discovered in August 2020 would have been promptly detected and corrected before causing harm to advertisers. But such steps would have also reduced LinkedIn's revenues, and thus LinkedIn willfully or recklessly refused to take such steps.

48.     Meanwhile, LinkedIn has advised that it issued "credits" to advertisers "potentially impacted" by the inflated metrics. But it has not disclosed how it calculated the "credits," or how it determined which advertisers were "impacted." Instead, LinkedIn has taken the position that it is free to unilaterally decide without any accountability which advertisers to compensate, and what sums to pay them. But having effectively admitted that deficient auditing processes and systems inflated key metrics for hundreds of thousands of advertisers for more than two years, LinkedIn must fully compensate all impacted advertisers for all harm caused by those inflated metrics,

---

[27] See "Virtually All Fraud'—Were You The Perp, The Conduit, Or The Sucker?" Nov. 19, 2020 https://www.forbes.com/sites/augustinefou/2020/11/19/virtually-all-fraudwere-you-the-perp-the-conduit-or-the-sucker/?sh=2764afc84379 (last visited on Jan. 18, 2021) (programmatic ad exchanges have an incentive to ignore fraud because inflated ad impressions inflate ad revenues). By analogy to the stock market, fraud would be much more rampant were public companies permitted to self-audit their financial statements.

1    including but not limited to the inflated prices advertisers paid for ads for more than two years due

2    to the inflated metrics.

3          49.    Credible public sources also indicate that measurement errors on LinkedIn's

4    platform extend beyond those tied to impressions and video views to other errors that have

5    remained undetected (or undisclosed) to date. LinkedIn must compensate advertisers for all harm

6    caused by all inflated metrics that have existed or continue to exist.

7    **G. The LinkedIn Platform is Plagued by Fraud, Including Invalid Clicks**

8          50.    Approximately five months ago, Ryan Gellis — the founder of RMG, an

9    established digital marketing agency — published a post on LinkedIn asking for feedback on his

10   theory that the "LinkedIn ad network is full of fraudulent accounts and **unchecked misclicks** that

11   artificially inflate the cost of advertising and result in poor performance compared to other ad

12   networks." Gellis cited three factors supporting his suspicions: (1) the actual cost-per-click for

13   certain advertising campaigns was *6-12 times higher* than LinkedIn had projected; (2) the

14   advertising spend on LinkedIn happens so unbelievably fast that "it's unrealistic that LinkedIn

15   could so quickly match the intended audience with legitimate users as quickly as it does;" and (3)

16   the behavior of the users clicking through on ads to visit websites is highly abnormal.[28]

17         51.    Gellis traced these issues to LinkedIn's lack of third-party verification: "A big

18   problem is that the social networks don't allow third-party analysis of their advertisement

19   platforms like Google. *So when they say 'we registered a click' and display that to you in a*

20   *dashboard, the industry standard way to know that's accurate isn't applied*."[29]

21         52.    Several sales and marketing professionals on LinkedIn agreed with Gellis'

22   assessment.  One (Tristan Oker) commented, "I think there is some merit to this." Another (Neil

23   DuPaul) stated, "I've had experience with LinkedIn ads over my last two positions and despite

24   wanting to believe the opposite, I agree with you on many points." And yet another (Albert Levett)

25

26   [28] https://www.linkedin.com/posts/ryan-gellis_theory-the-linkedin-ad-network-is-full-of-activity-6700077824360910848-LysO/ (last visited on Jan. 18, 2021).

27   [29] *Id.*

28

1   remarked that the results of his campaigns "are a little random (sometimes great, other times

2   poor)," and suggested "this could be due to [Gellis'] theory."[30]

3       53.    Subsequently, Gellis published a YouTube video discussing abysmal results for

4   two LinkedIn campaigns his agency launched to generate event registrations, including anomalous

5   behavior by so-called LinkedIn members clicking on the ads.[31] Commenting on the video, a

6   marketing professional (Heather Nix) stated, "I feel like the **last 2-3 years** have been horrible for

7   ROI on LinkedIn. So much so that I've all but given up on it as an ad channel and am focused on

8   organic now."[32] Ad fraud expert and Forbes columnist Dr. Augustine Fou cited Gellis' experiment

9   as one example of ad fraud "so obvious that anyone can tell just by looking at [the] analytics."[33]

10      54.    Gellis' revelations, and the validation he received from Dr. Fou and other

11  professionals, show two things. *First*, that LinkedIn's measurement errors also extend to metrics

12  tied to clicks. LinkedIn must also fully compensate advertisers for all harm caused by such inflated

13  metrics (and not just the harm caused by inflated metrics tied to impressions and video views).

14  *Second*, LinkedIn's auditing processes and systems for detecting invalid metrics remain deficient

15  since LinkedIn has apparently not detected the invalid clicks and other fraudulent activity

16  uncovered by Gellis. As a result, Plaintiff and other advertisers continue to face an actual threat of

17  future harm of being further exposed to inflated metrics on LinkedIn that can only be addressed

18  by injunctive relief. [34]

19  _____

20  [30] *Id.*

21  [31] "Why Your LinkedIn Marketing Campaign Isn't Working" Aug. 24, 2020.
    https://www.youtube.com/watch?v=jKuyxgWuiRM (last visited on Jan. 18, 2021).

22
23  [32] https://www.linkedin.com/in/ryan-gellis/detail/recent-activity/shares/ (last visited on Jan. 18,
    2021).

24  [33] "Fraud So Obvious, You Can See It In Analytics (If You Looked)"
25  https://www.forbes.com/sites/augustinefou/2020/09/08/fraud-so-obvious-you-can-see-it-in-your-
    own-analytics/?sh=5ac094267904 (last visited on Jan. 18, 2021). *See also*
26  https://www.linkedin.com/in/augustinefou/ (last visited on Jan. 18, 2021).

27  [34] While the retention of the MRC was a necessary step towards strengthening LinkedIn's
    auditing processes and systems (i.e., so LinkedIn was no longer self-auditing), such retention
28  alone is not sufficient to protect Plaintiff and Class members from future harm from inflated

## PLAINTIFF'S EXPERIENCE

55.     Plaintiff offers technology solutions to skilled nursing and long-term care (LTC) facilities to help them reduce their pharmacy spend.

56.     Plaintiff has been purchasing and paying for LinkedIn ads (including video ads) since April 2019, and continues to advertise on LinkedIn.

57.     Plaintiff saw and relied on the metrics displayed in Campaign Manager (including, but not limited to, metrics related to video ads) to analyze the performance and effectiveness of its campaigns, and make decisions concerning its spending on LinkedIn ads. Further, had LinkedIn disclosed that its auditing processes and systems were deficient, and therefore metrics were inflated, Plaintiff would have been aware of such disclosure and behaved differently in terms of its ad spending decisions.

58.     Plaintiff justifiably relied on LinkedIn to display accurate metrics in Campaign Manager and maintain adequate auditing processes and systems.

59.     In November 2020, Plaintiff became aware of the measurement issues publicly disclosed by LinkedIn. However, because Plaintiff does not have access to the systems necessary to audit and verify the metrics displayed in Campaign Manager, it has no means of determining the extent to which it was damaged by those errors, and/or other errors detected by third parties.

60.     Accurate metrics were material to Plaintiff—it would have wanted to know that LinkedIn's auditing processes and systems were deficient, and that the metrics displayed in Campaign Manager were consequently inflated.

61.     As a result of LinkedIn's misconduct alleged herein, Plaintiff paid for certain ads for which it should not have paid anything at all, paid more for other ads than it otherwise would

---

metrics without further transparency into the "improvements" that LinkedIn has indicated it will implement with respect to its internal auditing processes and systems. *See* "Marketers, It's Better To Grade Your Own Homework" Jan 12, 2021 https://www.forbes.com/sites/augustinefou/2021/01/12/marketers-its-better-to-grade-your-own-homework/?sh=6d252514291d (last visited on Jan. 18, 2021) (explaining why being MRC-accredited is not sufficient for detection purposes).

have paid, and purchased more ads than it otherwise would have purchased, absent the inflated metrics.

62.     Finally, because Plaintiff continues to advertise on LinkedIn, it faces an actual threat of future harm of being further exposed to inflated metrics on LinkedIn.

## CLASS ALLEGATIONS

63.     Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) on behalf of the following proposed Class:

> All persons or entities in the United States who, from January 21, 2017, to the present, paid for advertisements on LinkedIn's platform.

64.     Specifically excluded from the Class are LinkedIn, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers or entities controlled by LinkedIn, and their heirs, successors, assigns, or other persons or entities related to or affiliated with LinkedIn and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

65.     Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

66.     This action may be certified as a class action under Federal Rules 23(a) and 23(b)(3) because it satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements therein.

67.     *Numerosity.* The members of the Class are so numerous that joinder of all members is impracticable.  While the precise number of Class members is presently unknown, LinkedIn has disclosed that over 418,000 advertisers were potentially impacted by inflated metrics over a 2+ year period.

68.     *Existence and predominance of common questions of law and fact.*  Common questions of law and fact exist as to all members of the Class and predominate over any questions

CLASS ACTION COMPLAINT

affecting only individual Class members.  The common factual and legal questions include, but are not limited to, the following:

(a)    Whether and the extent to which metrics displayed in Campaign Manager were inflated;

(b)    Whether and the extent to which LinkedIn's auditing processes and systems for monitoring the accuracy of metrics were deficient;

(c)    Whether and the extent to which LinkedIn charged Class members for ads for which they should not have paid anything at all because of inflated metrics;

(d)    Whether and the extent to which Class members paid higher prices than they otherwise would have paid, and bought more ads than they otherwise would have bought, because of inflated ad metrics;

(e)    Whether LinkedIn engaged in fraudulent, unfair, and/or unlawful business practices under the UCL;

(f)    Whether LinkedIn fraudulently (or in the alternative, negligently) misrepresented the accuracy of its metrics;

(g)    Whether LinkedIn breached its implied contractual duty to perform with reasonable care;

(h)    Whether Class members are entitled to an accounting;

(i)    Whether LinkedIn's misconduct harmed Class members, and the amount of such harm; and

(j)    Whether Class members are entitled to injunctive relief.

69.    ***Typicality.***  Plaintiff's claims are typical of the claims of the other Class members in that Plaintiff and other Class members were injured by the same course of wrongful conduct by LinkedIn.

70.    ***Adequacy of representation.***    Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action.  Further, Plaintiff has no interests that are antagonistic to those of the other Class members.

71.    ***Superiority.***  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by

individual Class members is relatively small compared to the burden and expense that would be involved in individual litigation of their claims against LinkedIn.  It would, thus, be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single United States District Court, and presents no unusual management difficulties under the circumstances presented in this case.

72.     The Class may also be certified under Rules 23(a) and 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of (i) inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for LinkedIn, or (ii) adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

73.     The Class may also be certified under Rules 23(a) and 23(b)(2) because LinkedIn has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to members of the Class as a whole.

### COUNT I

**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, _et seq._**

74.     Plaintiff re-alleges and incorporates by reference herein all of the allegations set forth above.

CLASS ACTION COMPLAINT

- 21 -

75.     LinkedIn violated California's UCL, Cal. Bus. & Prof. Code §17200 *et seq.*, by engaging in the fraudulent, unfair and unlawful business practices alleged herein. The conduct alleged herein is a "business practice" within the meaning of the UCL.

76.     LinkedIn's dissemination of inaccurate and inflated impressions, video views, clicks and other metrics to Plaintiff and other Class members violated the fraudulent prong of the UCL because such dissemination was likely to deceive reasonable Class members into believing that their advertisements were performing better than they actually were (which would lead Class members to pay more for ads than they otherwise would have paid, and purchase more ads than they otherwise would have bought).

77.     LinkedIn knew or should have known that its metrics were inaccurate and inflated. Reasonable auditing processes and systems would have promptly discovered the inaccurate and inflated metrics, and thus had LinkedIn implemented and maintained reasonable auditing processes and systems, it would have confirmed its metrics were inaccurate and inflated, and corrected them before Plaintiff and other Class members were harmed.

78.     Additionally, LinkedIn violated the fraudulent prong of the UCL by failing to disclose to Plaintiff and other Class members that its auditing processes and systems were deficient, and thus measurement errors were lurking undetected that inflated metrics and ad prices. LinkedIn had a duty to disclose those facts to Plaintiff and other Class members since (i) those facts were material (i.e., any reasonable advertiser would consider it important to know that LinkedIn's auditing processes and systems were deficient, and that this posed a significant risk of inflated metrics and ad prices), and (ii) LinkedIn had exclusive knowledge of and access to such facts. Had LinkedIn disclosed those facts, Plaintiff and other Class members would have been aware of them, and behaved differently by, among other things, adjusting their ad spending and bids, or ceasing advertising on LinkedIn altogether.

79.     LinkedIn's dissemination of metrics it knew or should have known were inaccurate and inflated, and nondisclosure of its deficient auditing processes and systems, also constituted unfair practices under the UCL, since they were (i) oppressive, immoral, unethical, and

1    unscrupulous, (ii) caused Plaintiff and other advertisers substantial injury (given the millions paid

2    by Class members to LinkedIn for ads based on inflated metrics), and (iii) violated established

3    public policy against deceptive conduct by businesses. Further, such misconduct allowed LinkedIn

4    to have an unfair advantage over competitors who displayed accurate advertising metrics, and

5    properly audited their metrics.  Additionally, the justifications or reasons for, or the utility or

6    benefit (if any) of LinkedIn's unfair and deceptive acts and business practices were substantially

7    outweighed by the substantial economic harm that such conduct caused to Plaintiff and other Class

8    members. Finally, the harm caused by LinkedIn's deceptive conduct was not one that Plaintiff and

9    other Class members could have reasonably avoided, given LinkedIn's exclusive access to the raw

10   data underlying the metrics that it disseminated, and exclusive knowledge concerning its auditing

11   processes and systems.

12          80.    LinkedIn's dissemination of metrics it knew or should have known were inaccurate

13   and inflated, and nondisclosure of its deficient auditing processes and systems, also constituted

14   unlawful practices under the UCL because they violated California's False Advertising Law.  *See*

15   California False Advertising Law (Cal Bus. & Prof. Code §17500) ("FAL"). The misconduct

16   alleged violated the FAL for the same reasons alleged above that it violated the fraudulent prong

17   of the UCL.

18          81.    Because of LinkedIn's violations of the fraudulent, unfair and unlawful prongs of

19   the UCL, Plaintiff and other Class members have suffered harm — they paid for certain ads for

20   which they would not have paid anything at all, paid more for other ads than they otherwise would

21   have paid, and purchased more ads than they otherwise would have bought.

22          82.    Plaintiff has standing to bring claims against LinkedIn for fraudulent, unfair and

23   unlawful practices under the UCL on behalf of itself and Class members because it saw and relied

24   on LinkedIn's false representations concerning the accuracy of the metrics in Campaign Manager

25   to analyze campaign performance and make decisions concerning its spending on LinkedIn ads,

26   and suffered economic injury as a result of such reliance. Further, Plaintiff relied on LinkedIn's

27   omissions concerning the adequacy of LinkedIn's auditing processes and systems since had

28

CLASS ACTION COMPLAINT

LinkedIn disclosed that its auditing processes and systems were deficient, Plaintiff would have been aware of such disclosure and behaved differently in terms of its ad spending decisions.

83. LinkedIn knew or should have known that Plaintiff regarded, or was likely to regard the accuracy of the metrics in Campaign Manager, and the adequacy of LinkedIn's auditing processes and systems, as important to Plaintiff's decisions concerning LinkedIn advertising. Indeed, any reasonable advertiser would consider it important to know that the metrics displayed in Campaign Manager were inflated, and that LinkedIn's auditing processes and systems were deficient. Accordingly, LinkedIn's false representations and omissions were material.

84. Because of LinkedIn's false representations and omissions, Plaintiff paid for certain ads for which it would not have paid anything at all, paid more for other ads than it otherwise would have paid, and bought more ads than it otherwise would have bought, absent the inflated metrics. Accordingly, LinkedIn's false representations and omissions were an immediate cause of Plaintiff's losses.

85. By reason of the fraudulent, unfair and unlawful practices of LinkedIn alleged above, Plaintiff seeks monetary compensation on behalf of itself and other Class members for all losses suffered as a result of such practices. Additionally, Plaintiff and other Class members continue to purchase advertising on LinkedIn, and thus face an actual threat of future harm of being further exposed to inflated metrics on LinkedIn. Plaintiff therefore requests injunctive relief to prevent future harm to itself and other Class members.

## COUNT II

### Fraudulent Misrepresentation

86. Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

87. As alleged in paragraphs 76 and 78 above, LinkedIn made misrepresentations both by disseminating inaccurate and inflated metrics to Plaintiff and other Class members, and concealing its deficient auditing processes and systems from Plaintiff and other Class members.

88.     LinkedIn's misrepresentations were material since any reasonable advertiser would consider it important to know that the metrics displayed in Campaign Manager were inflated, and that LinkedIn's auditing processes and systems were deficient.

89.     LinkedIn made its misrepresentations with knowledge of their falsity, or with reckless disregard for their truth.

90.     LinkedIn made its misrepresentations with the intent of increasing its revenue by inducing Plaintiff and other Class members to pay for ads for which they should not have paid anything at all, pay more for other ads than they otherwise would have paid, and buy more ads than they otherwise would have bought.

91.     Plaintiff and other Class members justifiably relied on LinkedIn's misrepresentations since LinkedIn had exclusive knowledge of all material facts relating to the accuracy of the metrics in Campaign Manager and the adequacy of its auditing processes and systems.

92.     As a result of LinkedIn's misrepresentations, Plaintiff and other Class members were injured by paying for ads for which they should not have paid anything at all, paying more for other ads than they otherwise would have paid, and buying more ads than they otherwise would have bought.

## <u>COUNT III</u>

### Negligent Misrepresentation

93.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

94.     As alleged in paragraphs 76 and 78 above, LinkedIn made misrepresentations both by disseminating inaccurate and inflated metrics to Plaintiff and other Class members, and concealing its deficient auditing processes and systems from Plaintiff and other Class members.

95.     LinkedIn's misrepresentations were material since any reasonable advertiser would consider it important to know that the metrics displayed in Campaign Manager were inflated, and that LinkedIn's auditing processes and systems were deficient.

CLASS ACTION COMPLAINT

96.     As an alternative to pleading scienter, Plaintiff alleges that, at a minimum, LinkedIn made its misrepresentations without reasonable grounds for believing they were true.

97.     LinkedIn made its misrepresentations with the intent of inducing reliance on such misrepresentations.

98.     Plaintiff and other Class members justifiably relied on LinkedIn's misrepresentations since LinkedIn had exclusive knowledge of all material facts relating to the accuracy of the metrics in Campaign Manager and the adequacy of its auditing processes and systems.

99.     LinkedIn owed a duty to Plaintiff and other Class members not to misrepresent the accuracy of its metrics, or the adequacy of its auditing processes and systems, and breached that duty by its misrepresentations.

100.    As a result of LinkedIn's misrepresentations, Plaintiff and other Class members were injured by paying for ads for which they should not have paid anything at all, paying more for other ads than they otherwise would have paid, and buying more ads than they otherwise would have bought.

## <u>COUNT IV</u>

**Breach of Implied Duty to Perform with Reasonable Care**

101.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

102.    Plaintiff and other Class members contracted with LinkedIn to provide them with advertising services.  They did so through LinkedIn's common advertising interface, Campaign Manager, where Plaintiff and other Class members can, among other things, submit advertisements, set advertising budgets, select target audiences, and most critically, view metrics that enable them to analyze the performance and ROI of their advertising campaigns, and make decisions about ad spend.

103.   Plaintiff and other Class members met all or substantially all of their contractual obligations, including but not limited to, submitting their advertising for LinkedIn's approval and paying for LinkedIn's advertising services.

104.   LinkedIn has obligations to invoice Plaintiff and other Class members accurately based on the standards that LinkedIn itself has established, to display accurate ad metrics in Campaign Manager, and to implement adequate auditing processes and systems to ensure that the ad metrics in Campaign Manager are accurate and not inflated.

105.   There is not one integrated contract that spells out LinkedIn's obligations to the Class, but the obligations above can be determined by reference to LinkedIn's course of dealing and performance with the Class, industry practice, and from various web pages created and maintained by LinkedIn, including the "LinkedIn Ads Agreement" (https://www.linkedin.com/legal/sas-terms), LinkedIn's "User Agreement" (https://www.linkedin.com/legal/user-agreement), LinkedIn's "LinkedIn Advertising Policies" (https://www.linkedin.com/legal/ads-policy), and various help pages on LinkedIn's website (*see, e.g.*, paragraphs 35-37 above), among others. In particular, the current LinkedIn Ads Agreement provides in Section 2 that the "Ad Services are designed to ***enhance the effectiveness of your campaigns***," and in Section 4 that "[y]ou may use Ad Services Data only on an aggregate and anonymous basis ***to assess the performance and effectiveness of your campaigns and to optimize your campaigns***."[35]

106.   LinkedIn had a duty to perform the obligations above competently and with reasonable care.  LinkedIn breached that duty by, among other failures, invoicing advertisers based on inflated metrics; reporting inflated metrics to advertisers in Campaign Manager; and failing to implement adequate auditing processes and systems to promptly detect and fix inflated metrics.

---

[35] "Ad Services Data" is defined in Section 4 as "any data obtained in connection with the Ad Services [i.e., LinkedIn's online advertising platform and the associated self-serve, auction-based ad services]."

CLASS ACTION COMPLAINT

107.   Had LinkedIn used reasonable care to retain MRC to audit its metrics when its industry peers did back in early 2017, and reasonably invested in its auditing processes and systems, the measurement errors disclosed would have been promptly detected and fixed before harming advertisers, and LinkedIn would not have displayed inflated metrics in Campaign Manager for such lengthy periods of time.

108.   As a result of LinkedIn's failure to provide its agreed advertising services competently and using reasonable care, Plaintiff and other Class members failed to receive the benefit of their bargain, including paying for ads for which they should not have paid anything at all, paying more for other ads than they otherwise would have paid, and buying more ads than they otherwise would have bought.

### COUNT V

### Accounting

109.   LinkedIn on the one hand, and Plaintiff and other Class members on the other, are in a business relationship that requires an accounting because LinkedIn has conceded that it owes money to Plaintiff and other Class members as a result of inflated metrics tied to impressions and video views.

110.   Calculation of the sums due Plaintiff and other Class members from the inflated metrics is complex, and LinkedIn has failed to provide Plaintiff and other Class members with adequate detail concerning the nature and scope of the inflated metrics, and the extent of the harm caused by such inflated metrics to Plaintiff and other Class members.

111.   All of the data and other information necessary to calculate the harm caused by Plaintiff and other Class members by the inflated metrics are exclusively within the control of LinkedIn.

112.   Having conceded it owes money to Plaintiff and other Class members, LinkedIn is not entitled to unilaterally decide without any accountability or oversight which Class members to compensate and how much to pay them.

CLASS ACTION COMPLAINT

113.   As a result, Plaintiff and other Class members seek, at a minimum, an order requiring LinkedIn to provide a full and complete accounting of all transactions and records relating to Plaintiff's and other Class members' advertising on LinkedIn to enable Plaintiff and other Class Members to determine the nature and scope of the inflated metrics, and the extent of the harm caused by such inflated metrics to Plaintiff and other Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for a judgment in its favor and in favor of the Class as follows:

A.   Certifying this action as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel, under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding declaratory and injunctive relief, including, but not limited to, (i) prohibiting LinkedIn from continuing to display inaccurate and inflated metrics, (ii) directing LinkedIn to implement adequate auditing processes and systems (in addition to MRC's audit) so that advertisers may rely on the integrity and accuracy of LinkedIn's metrics in the future; and (iii) directing LinkedIn to promptly disclose and fix any further inaccurate advertising metrics that it uncovers in the future;

C.   Awarding Plaintiff and the Class monetary compensation for all losses caused by Defendant's misconduct alleged herein, whether as restitution or damages;

D.   Directing Defendant to provide a full and complete accounting of all transactions and records relating to Plaintiff's and other Class members' advertising on Defendant's platform, and pay over to Plaintiff and other Class members the sums calculated to be due and owing to Plaintiff and the Class as a result of such accounting;

E.   Awarding Plaintiff and the Class punitive damages;

CLASS ACTION COMPLAINT

F.      Awarding Plaintiff and the Class attorneys' fees and costs (including, without limitation, under Section 1021.5 of the California Code of Civil Procedure);

G.      Awarding Plaintiff and the Class prejudgment and post-judgment interest; and

H.      Providing any and all further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

DATED:  January 21, 2021                    Respectfully Submitted,

By: */s/ Jordan L. Lurie*

Jordan L. Lurie (SBN 130013)
jlurie@pomlaw.com
Ari Y. Basser (SBN 272618)
abasser@pomlaw.com
**POMERANTZ LLP**
1100 Glendon Avenue, 15th floor
Los Angeles, CA  90024
Phone: (310) 432-8492
Fax:     (310) 861-8591

Joshua E. Fruchter (*pro hac vice to be requested*)
jfruchter@wohlfruchter.com
**WOHL & FRUCHTER LLP**
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Phone: (845) 290-6818
Fax: (718) 504-3773

*Counsel for Plaintiff and Proposed Class*